STATE, RESPONDENT, *v.* HANSON, APPELLANT.

(No. 3,443.)

(Submitted June 22, 1914. Decided June 25, 1914.)

[141 Pac. 669.]

*Criminal Law—Robbery—Attempt—Evidence—Insufficiency—*
*Intent—Proof Required.*

Robbery—Attempt—Evidence—Insufficiency.
    1. Proof of an assault, without circumstances tending to show an intent to commit robbery, *held* insufficient to convict defendant of an attempt to commit the latter crime.

Same—Intent—Evidence.
    2. Testimony of a witness that accused, charged with an attempt to rob, had solicited the witness some six days before the assault to join in committing robbery was too remote to supply the basis for an inference of the specific intent required, under section 8894, Revised Codes, to be present at the time of the alleged crime.

    [As to the question of intent as an element of proof in larceny cases, see note in 88 Am. St. Rep. 600.]

Same.
    3. While the intent with which an act is done may be inferred from the attendant circumstances, yet, when they are such as to furnish the basis for an inference of some intent other than that necessary to constitute the crime charged, or of the absence of any intent, a conviction of the crime charged cannot be sustained.

*Appeal from District Court, Lewis and Clark County; J. M. Clements, Judge.*

HAROLD S. HANSON was convicted of an attempt to commit the crime of robbery, and appeals from the judgment and an order denying him a new trial. Reversed and remanded.

*Mr. O. W. McConnell,* for Appellant, submitted a brief and argued the cause orally.

The information filed against the defendant is insufficient and defective in the following particulars: It fails to allege any overt act. "Indictments for attempts to commit a crime must aver the intent and the overt act constituting the attempt." (*Hogan* v. *State,* 50 Fla. 86, 7 Ann. Cas. 139, 39 South. 464; *State* v. *Brannan,* 3 Nev. 238; 22 Cyc. 363; *People* v. *Kane,* 161 N. Y. 380, 55 N. E. 946.) "Although an attempt to commit a

crime involves both a criminal intent and an overt act, yet it is not enough to charge an attempt merely, but both the intent and the overt act must be specifically alleged." (*State* v. *Wilson,* 30 Conn. 500; *State* v. *Doran,* 99 Me. 329, 105 Am. St. Rep. 278, 59 Atl. 440; *State* v. *Frazier,* 53 Kan. 87, 42 Am. St. Rep. 274, 36 Pac. 58.) The federal courts have likewise construed the sufficiency of an indictment charging an attempt to commit a crime. Overt acts must be alleged and proved. (*United States* v. *Ford,* 34 Fed. 26.) The language of the statute used in an indictment must be accompanied with such a statement of facts as informs the accused of the specific offense with which he is charged. (*United States* v. *Hess,* 124 U. S. 483, 31 L. Ed. 516, 8 Sup. Ct. Rep. 571; *State* v. *Stimson,* 24 N. J. L. 9; *State* v. *Thatcher,* 35 N. J. L. 445.) In addition to the foregoing, there are many other authorities sustaining the proposition that in an information for an attempt to commit a crime, there must be alleged the overt act constituting the attempt. (See *State* v. *Colvin,* 90 N. C. 717; *State* v. *Brown,* 95 N. C. 685; *Commonwealth* v. *Peaslee,* 177 Mass. 267, 59 N. E. 55; *Hicks* v. *Commonwealth,* 86 Va. 223, 19 Am. St. Rep. 891, 9 S. E. 1024; *Commonwealth* v. *Dean,* 109 Mass. 349; *People* v. *Thomas,* 63 Cal. 482.)

It fails to allege any assault. (McClain on Criminal Law, sec. 480, note 6, sec. 483; *State* v. *Brewer,* 53 Iowa, 735, 6 N. W. 62.) "In charging an attempt to commit larceny from the person, an assault must be alleged." So in charging an attempt to commit robbery, an assault must be alleged. (*Randolph* v. *Commonwealth,* 6 Serg. & R. (Pa.) 398.)

It fails to allege that the party had any personal property upon him. "An information for robbery which fails to allege the ownership of the property taken does not constitute a valid charge of assault with intent to commit robbery." (*People* v. *Ammerman,* 118 Cal. 23, 50 Pac. 15.) "The information must allege a present ability to carry the attempt into execution." (*State* v. *Bohn,* 19 Wash. 36, 52 Pac. 325.) ·

It fails to give any description or value of property. It is usual and customary in an information for robbery or for lar-

ceny to describe the particular things sought to be taken, and while the value thereof may be immaterial, some description thereof is necessary as advising the defendant with what he is charged of doing and informing the jury of the purpose the defendant was seeking to accomplish.

*Mr. D. M. Kelly,* Attorney General, and *Mr. C. S. Wagner,* Assistant Attorney General, for the state, submitted a brief; *Mr. Wagner* argued the cause orally.

In *Jackson* v. *State,* 91 Ala. 55, 24 Am. St. Rep. 860, 8 South. 773, the doctrine is laid down that ''an attempt'' implies both an intent and actual effort to consummate the intent. Hence an indictment charging an ''attempt'' to commit larceny is sufficient without alleging the particular acts constituting the ''attempt.'' (See, also, *People* v. *Moran,* 123 N. Y. 254, 20 Am. St. Rep. 732, 10 L. R. A. 109, 25 N. E. 412.) In *People* v. *Bush,* 4 Hill (N. Y.), 133, it is held that an attempt in any form to commit an offense is within the statute, and the particular manner in which the attempt was made need not be pointed out in the indictment, nor is it necessary to allege an assault. (See, also, *People* v. *Burns,* 138 Cal. 159, 69 Pac. 16, 70 Pac. 1087.)

It is said that the information is bad because it fails to allege a description or value of the property attempted to be taken, and because it fails to allege that the prosecuting witness had any personal property upon him. No authorities are cited by counsel for appellant, but we take the liberty of citing *Clark* v. *State,* 86 Tenn. 511, 8 S. W. 145, where the precise points raised by appellant were considered by the Tennessee court, and it was held that such allegations are unnecessary in charging an attempt. (*State* v. *Utley,* 82 N. C. 556.)

As bearing generally upon the proposition as to whether or not the information states facts sufficient to constitute a public offense, see *State* v. *Paisley,* 36 Mont. 237, 92 Pac. 566; *State* v. *Clancy,* 20 Mont. 498, 52 Pac. 267; *State* v. *Mish,* 36 Mont. 168, 122 Am. St. Rep. 343, 92 Pac. 459; *State* v. *Pemberton,* 39 Mont. 530, 104 Pac. 556; sec. 9157, Rev. Codes.

The authorities seem to hold that to constitute an attempt, there must be more than mere preparation; there must be acts done with intent to commit a crime, but which fall short of its actual commission. (12 Cyc. 177.) Such is the purport of our Code provision (Rev. Codes 8894), but it is not necessary to show the last proximate act to the consummation of the crime in contemplation, for it is enough to prove acts apparently adopted to produce the result intended, provided more than mere preparation be shown. (*Glover* v. *Commonwealth,* 86 Va. 382, 10 S. E. 420; *Hicks* v. *Commonwealth,* 86 Va. 223, 10 Am. St. Rep. 891, 9 S. E. 1024; 12 Cyc. 178.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The defendant was convicted of an attempt to commit the crime of robbery upon the person of one Frank Skader. He has appealed from the judgment and an order denying his motion for a new trial. The contentions made in his behalf are that the information does not state facts sufficient to constitute a public offense; that the court erred in submitting instructions to the jury; and that the verdict is contrary to the evidence. We find no merit in any of these contentions, save the last.

It is alleged in the information that the offense was committed on September 22, 1913. The facts as disclosed by the testimony of the witnesses are the following: About 11 o'clock on the evening in question, Skader met one James O'Brien at a saloon referred to in the record as "Rossman's place" on upper Main street in the city of Helena. Skader then had upon his person a watch and a considerable sum of money. O'Brien invited him to have a glass of beer. The two then left the place and walked east a short distance up State street. Skader went with O'Brien for the purpose of pointing out to him the location of the red light district; O'Brien being unacquainted with the city. As they went up State street, they passed the defendant and another person going in the opposite direction. O'Brien invited Skader to accompany him on a visit to the district, but, Skader having

declined the invitation, the two turned back, and crossing State street, entered another saloon conducted by one Lissner, on the northeast corner of Main and State streets. They entered from State street by a side door at the rear of the building. The defendant and his companion had preceded them. The doorway opens upon a platform partially inclosed from which steps—four or five in number—lead down to the floor on a level with Main street, on which the building fronts. The rear portion of the room is separated from the saloon proper by a light partition and is used for a pool-room. This room was then well lighted. Several persons were present sitting about the room or engaged in playing pool. As the two were about to pass down the steps into the room, the defendant came out of a second door leading from the platform into a toilet and struck Skader on the head with his fist or a billy, and felled him to the floor, rendering him unconscious. The defendant then passed out of the side door. O'Brien helped Skader from the floor and to a chair in the saloon, and, so far as the evidence shows, then left him. After recovering, Skader returned to Rossman's place, where he spent the rest of the night, being afraid, as he said, to go to his room, to reach which he would have to go up State street. It does not appear where O'Brien and the defendant went from Lissner's place, except that defendant stated that he went up State street to his home. Both were strangers to Skader. Skader, O'Brien and the defendant were the only witnesses who testified as to what occurred at the time of the alleged offense.

Skader testified: "I saw him [Hanson] in Lissner's, which is at the upper end of Main street and State street, right at the corner. The part of Lissner's that I saw him in was the doorway; from State street is a kind of small room, and I was stepping in there, and he hit me with a club in the head." The witness then stated that a billy exhibited to him looked like the kind of a club with which he was hit. He described the room and stated that, just as he stepped inside, Hanson hit him with a club on the head, illustrating where he hit him and how the blow was delivered. He continued: "A fellow named O'Brien was with me at the time and stepped into the saloon with me. Mr.

O'Brien went in first; I was walking right behind him. I followed O'Brien into the saloon, but I didn't get a chance to go farther, except I got in the door, that is as far as I could go, because I was struck with a club. * * * O'Brien went in the side door of Lissner's first; I went in after him, right behind him. O'Brien was just going down the steps in front of me when I was hit. As to where I was hit from, from the side or in front or from behind, or from what angle—somebody came from behind out of this little room that I speak of, and I didn't shut the door shut, and turned around and I see the club. I just turned my head and I see Mr. Hanson with the club and he hit me. I don't know what happened then; I couldn't tell that. * * * As to knowing that anybody was trying to rob me and saying anything about my money, I only know just that, I got hit. Nobody said anything about my money that I know of. I couldn't state whether anybody tried to get it, whether anybody tried to get my money from my person; no, sir, I couldn't say that. * * * It looks to me like somebody was trying to rob me that night; I couldn't tell for sure that way. * * * I couldn't tell why this party that knocked me on the floor did not take my money then. As to whether I know whether this was robbery at all of my own knowledge, or an attempt to rob me, it seems to me kind a like they tried to rob me. * * * I did not lose anything at that time; there was nothing taken away from me."

O'Brien testified: "We went into the Lissner saloon. This Frank, he opened the door, and I stepped in ahead of him. When he entered the door and stepped in ahead, I started to walk in. The first thing I know I heard something. He says, 'I am hit.' At first I heard, 'Son-of-a-bitch,' he says, 'I am hit.' I turned around and the man hit him. Mr. Hanson was the man that hit him. It looked to me that he hit him with something like that thing you have got on that desk there; I don't know that it was that, but something like that. He hit him on the head. I then turned around. I said, 'Nix, none of that.' Then he quit. He didn't hit him no more. No, he didn't try to hit him again. He pushed him away from him and laughed

and walked out of the door. He opened the door with one hand and pushed the man away with the other. * * * There was no money mentioned at all, and there was no attempt to get into his pocket by anybody. Hanson passed out of the door and I went down the steps."

Clarence Miles testified that he had some six days prior to the evening in question had a couple of conversations with the defendant, and that in one of them the defendant had suggested, "Let us go out and hold somebody up and get some dough." Miles replied to this that he would see defendant around that night, but did not thereafter see him.

The defendant testified that he went into the side door of Lissner's place and stepped into the toilet. When he came out he had made up his mind to go home. He said: "I turned around and started out the door. Just as I reached for the door, O'Brien walked in, and I turned around and looked at him; I stepped into this other fellow. I didn't know who this other fellow was then. I guess he was Mr. Skader. He bumped into me and stepped on my foot, and he called me a son-of-a-bitch, and I lost my temper and hit him. I hit him with my fist. I hit him once and then just gave him a shove and walked out the door. From there I went right home, right straight up State street. There were no words passed between me and the parties I met in the door; he just said, 'Son-of-a-bitch,' and I said, 'Son-of-a-bitch, eh?' and I just hit him; that was all that was said. * * * At the time when I was going out of Lissner's saloon, and when I say I met O'Brien and Skader, I did not attempt to rob Skader by taking his money or in any way taking his property. No intention of taking his money ever entered my mind." It does not appear that either O'Brien or defendant knew that Skader had money upon his person. Skader was dressed as a common laborer, which he was, and had his watch hidden from view in a pocket under the bib of his overalls. He had not stated to anyone that he had money, nor had he exhibited any.

This evidence—which is all that reflects light upon the incident —while demonstrating that the defendant committed an unpro-

[1] voked assault upon Skader, does not justify the conclusion that his purpose was to commit the crime of robbery; for, though this crime can be accomplished only by means of force or fear (Rev. Codes, sec. 8309), and is most frequently accompanied by an assault, proof of an assault without circumstances tending to show that it was resorted to as a means to prevent resistance, and in order to obtain property from the person or immediate presence of the one assaulted, falls far short of establishing the crime of an attempt to commit robbery. An essential element of this crime is the intent. "An act done with intent to commit a crime, and tending but failing to effect its commission, is an attempt to commit that crime." (Rev. Codes, sec. 8894.)

The circumstances attending the assault must disclose the [2] intent, otherwise the crime is assault only. The only fact offered by the state to supply the element of intent is the statement by the witness Miles that he had been solicited by the defendant, some six days before the assault upon Skader to join him in committing robbery. This had no reference to Skader. It was too remote to supply the basis for an inference of the specific intent necessary to be present at the time the assault was committed upon Skader. It tended to show a disposition merely and not a specific intent. And this is true though Skader was fully impressed with the conviction that defendant's purpose was to rob him. While it may be conceded that the defendant exhibited a general disposition which would lead him to commit robbery, the conclusion that he intended to rob Skader in a lighted room, in plain sight of O'Brien and apparently of the other persons present, does not seem to be in accord with the observation and experience of the ordinary man.

Furthermore, the absence of any evidence tending to show any reason why the defendant desisted from carrying out the alleged purpose lends support to the notion that the assault was delivered, as defendant said, because he was bumped by Skader as he came out of the toilet, and lost his temper. As a whole, the circumstances are, to say the least, as consistent with this conclusion as with the conclusion that there was present the specific intent to commit robbery. The intent with which an act

[3] is done may be inferred from the attendant circumstances; but, when the circumstances are such as to furnish the basis for an inference of some intent other than that necessary to constitute the particular crime charged, or the absence of any intent, a verdict of guilty of the crime charged cannot be sustained, no matter what other crime the evidence tends to establish.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. Justice Holloway and Mr. Justice Sanner concur.

(Submitted June 22, 1914. Decided June 27, 1914.)