STATE, RESPONDENT, v. BENSON, APPELLANT.

(No. 6,913.)

(Submitted November 2, 1931. Decided November 18, 1931.)

[5 Pac. (2d) 223.]

*Mr. W. B. Sands* and *Mr. C. R. Stranahan,* for Appellant, submitted a brief.

*Mr. L. A. Foot,* Attorney General, *Mr. T. H. MacDonald,* Assistant Attorney General, and *Mr. Harry L. Burns,* County Attorney of Blaine County, for the State, submitted a brief; *Mr. MacDonald* and *Mr. Burns* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Hezekiah Benson, a man past seventy years of age, was convicted of the crime of attempting to maim livestock, and sentenced to serve one year in the penitentiary, but sentence was suspended; he has appealed from the judgment.

The specifications of error made challenge the sufficiency of the evidence to sustain the charge or connect defendant with the crime, and the action of the court in admitting certain exhibits in evidence.

The facts and circumstances established by the evidence are substantially as follows: Benson and Rodney Stam, owner of land adjoining that of Benson and cashier of the Lohman State Bank, had had some trouble over money matters and a line fence, or the lack thereof, prior to May, 1930, and Stam suspected Benson of having poisoned one of his horses. On May 4, 1930, Stam drove to his land and, finding a gate open, was uneasy concerning two horses he had in his pasture, but was too busy with other matters to look for them until late in the afternoon, when he found them in Benson's field seriously wounded; each had received a charge of shot, fired from a shotgun, along the barrel and shoulder, most of the shot being deeply imbedded just back of the left shoulder. Tracing the tracks of the horses back from where they were found, Stam and others discovered the point where, from indications on the ground, they had been shot, and, about ten feet distant, found human tracks which, when traced, showed that a man had traveled from the Benson house to the point indicated and then returned to the house.

Another neighbor with whom Benson had had trouble in the past and who had on the evening of May 4 offered to "shoot

it out'' with him, testified that, between 10 and 11 o'clock on that day, he had seen Benson open his gate and let two horses, the description of which fitted the animals later found wounded, into his field, and that Benson then went to the house and returned to the field with a gun. A short time after, from a point from which the field could not be seen, the witness and his wife heard two shots fired.

Benson was arrested on a warrant regularly issued, and, in making the arrest in the Benson home, the sheriff took from the house a pair of shoes, a shotgun and shells for it. On comparison the shoes were found to fit the tracks mentioned, and the shot in the shells were the same size as those taken from one of the horses.

On the trial the defendant admitted that the shoes were his, but he and his son testified that the son was wearing them on May 4, and that the son had the only shotgun on the ranch; however, the son was working on another ranch that day, and, while he could have made the tracks, he could not have shot the horses at the time the shots were heard. The trial was had a year after the shooting and, at that time, one of the horses was still in no condition to be worked; the other could be worked by favoring its left side.

1. The first contention is that, conceding the defendant shot the horses, the evidence does not establish an intent to "maim." It is urged that, had defendant so intended, he would have maimed the animals.

Section 11515, Revised Codes 1921, declares that "every person who willfully and maliciously kills or maims any livestock * * * not his own * * * is guilty of felony.''

With respect to human beings, the word "maims'' is synonymous with mayhem (*State* v. *Johnson,* 58 Ohio St. 417, 65 Am. St. Rep. 769, 51 N. E. 40), which is defined in this state as depriving a human being of a member of his body, or disabling, disfiguring, or rendering it useless, or cutting or disabling the tongue, putting out an eye, or slitting the nose, ear, or lip (sec. 10968, Rev. Codes 1921), and this interpreta-

tion is given by some courts to the word "maim" when used in statutes such as ours (*Spaulding* v. *State,* 25 Ga. App. 194, 102 S. E. 907), while other courts hold that the definition of "mayhem," as applied to maiming, is inapplicable with reference to animals, and the term should be construed in the sense in which it is generally understood, in which sense it is synonymous with crippling (*Turman* v. *State,* 4 Tex. App. 586); but all courts seem to agree that, in order to "maim" an animal, permanent injury must have been inflicted.

Whether or not the defendant might have been convicted of the crime of maiming the animals in question we need not determine; he was convicted of an attempt to do so, and could be so convicted even though the evidence shows that the crime of maiming was complete. (Sec. 11590, Rev. Codes 1921.)

The question here is, then, whether or not defendant, if he fired the shots, intended to maim the animals.

The intent with which an act is done may be inferred from attendant circumstances, but if such circumstances furnish the basis for an inference of some intent other than that necessary to constitute the crime charged, the proof does not establish the commission of that crime. (*State* v. *Hanson,* 49 Mont. 361, 141 Pac. 669.)

A man shooting a load of shot into an animal from a distance of ten feet, and at a point nearest its heart, cannot be said to have had any other intent than to either kill or seriously cripple the animal. If the person firing the shot had, by long experience, knowledge that the charge would not be sufficient to kill, he must have known and intended to seriously injure the animal, and must have known that an injury inflicted at that distance and with such a weapon was likely to be permanent. On the other hand, if such a person had not the knowledge suggested, such circumstances would give rise to the inference that he intended to kill the animal. We are not advised as to the defendant's experience as to the penetrating power of shot fired from a shotgun.

26

The evidence is sufficient to warrant the inference that defendant intended to either kill or maim the animals, if he fired the shots under the circumstances related, and it would be the limit of technical hair-splitting and a reproach upon the court to declare that, because we might infer an intent to kill from the circumstances, a verdict of attempt to maim, requiring proof of an intent to do so, should be set aside.

2. As to the assignment that the court erred in admitting the ██ shoes, shotgun, and shells in evidence, there is no suggestion in the record of an illegal search, other than the general statement in defendant's affidavit to suppress evidence that the officer searched the house without a search-warrant, which is denied by the sheriff under oath. The evidence on the trial is to the effect that the defendant was arrested in bed; beside the bed stood a chair on which his clothes reposed, and the shoes were beside the chair; the exact position of the gun is not disclosed, but the defendant testified that the shells were in plain sight, on a shelf in the room.

It is well settled that an officer lawfully making an arrest may not only search his prisoner and preserve for use on the trial articles found on his person or in his immediate possession (*State* v. *Hum Quock*, 89 Mont. 503, 300 Pac. 220), but, having lawfully gained access to the place where the arrest is made, may, as an incident to the arrest, take into his possession for use on the trial instrumentalities through which the crime was committed and other articles which will aid in proving that the person arrested committed the crime, particularly if such articles are in plain view and no search is required to uncover them. (*State* v. *Mausert*, 88 N. J. L. 286, L. R. A. 1916C, 1014, 95 Atl. 991; *State* v. *Laundy*, 103 Or. 443, 204 Pac. 958; *Argetakis* v. *State*, 24 Ariz. 599, 212 Pac. 372; *State* v. *Hughlett*, 124 Wash. 366, 214 Pac. 841; *Rusher* v. *State*, 94 Ga. 363, 47 Am. St. Rep. 175, 21 S. E. 593; *Wiggin* v. *State*, 28 Wyo. 480, 206 Pac. 373; *People* v. *Cona*, 180 Mich. 641, 147 N. W. 525.)

The constitutional rights of those accused of crime are sufficiently safeguarded under our practice without stretching the

search and seizure provision of our Constitution beyond recognition of its framers. The articles were not obtained by unlawful search and seizure (Const., Art. III, sec. 7), and their use on the trial of defendant did not compel him to become a witness against himself (Const., Art. III, sec. 18). (*Browne* v. *United States*, (C. C. A.) 290 Fed. 870; *Baron* v. *United States*, (C. C. A.) 286 Fed. 822.) The court did not err in permitting the shoes, gun and shells to be introduced in evidence.

3. Finally it is asserted that the evidence is insufficient to support the verdict of guilty. It is true, as asserted, that the witnesses against defendant showed prejudice and that fact was brought out clearly by the defense; but it went only to the credit to be given the witnesses and in no manner affected the admissibility of the testimony given, nor did it destroy the evidence. The question of the weight to be given to the evidence was for the jury, and the only question for our determination is as to whether or not the record contains substantial evidence sufficient to uphold the verdict and judgment. We have carefully read the transcript, and are convinced that the evidence, briefly stated above, is sufficient.

Judgment affirmed.

Mr. Chief Justice Callaway and Associate Justices Galen, Ford and Angstman concur.